**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **DELMAR P. MONTGOMERY,** | § | |
| **PLAINTIFF,** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO.** |
| | § | **4:12-CV-00574-Y** |
| | § | |
| **CAROLYN W. COLVIN,** | § | |
| **ACTING COMMISSIONER OF SOCIAL** | § | |
| **SECURITY,** | § | |
| **DEFENDANT.** | § | |

**FINDINGS, CONCLUSIONS AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**
**AND**
**NOTICE AND ORDER**

This case was referred to the United States Magistrate Judge pursuant to the provisions of

Title 28, United States Code, Section 636(b). The Findings, Conclusions and Recommendation

of the United States Magistrate Judge are as follows:

**FINDINGS AND CONCLUSIONS**

**I.    STATEMENT OF THE CASE**

Plaintiff Delmar P. Montgomery ("Montgomery") filed this action pursuant to Sections

405(g) and 1383(c)(3) of Title 42 of the United States Code for judicial review of a final decision

of the Commissioner of Social Security denying his claim for supplemental security income

("SSI") under Title XVI of the Social Security Act ("SSA"). On July 29, 2009, Montgomery

protectively applied for SSI benefits alleging that he became disabled on April 6, 2006.

(Transcript ("Tr.") 57; *see* Tr. 124-130, 145.)   His application was denied initially and on

1

reconsideration. (Tr. 52-57, 76-87.) The ALJ held a hearing on March 16, 2011 and issued a decision on April 14, 2011 that Montgomery was not disabled. (Tr. 11-67.) Montgomery filed a written request for review of the ALJ's decision, and the Appeals Council denied the request on June 20, 2012, leaving the ALJ's decision to stand as the final decision of the Commissioner. (Tr. 1-4.)

## II.    STANDARD OF REVIEW

SSI benefits are governed by Title XVI, 42 U.S.C. § 1381 *et seq.*, of the SSA. In addition, numerous regulatory provisions govern SSI benefits. *See* 20 C.F.R. Pt. 416. The SSA defines a disability as a medically determinable physical or mental impairment lasting at least twelve months that prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. § 1382c(a)(3)(A); *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed. 20 C.F.R. § 416.920.

First, the claimant must not be presently working at any substantial gainful activity. Substantial gainful activity is defined as work activity involving the use of significant physical or mental abilities for pay or profit. 20 C.F.R. § 416.972. Second, the claimant must have an impairment or combination of impairments that is severe. An impairment or combination of impairments is not severe if it has such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work. 20 C.F.R. § 416.920(c); *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985), *cited in Loza v. Apfel*, 219 F.3d 378, 392 (5th Cir. 2000). Third, disability will be found if the impairment or combination of impairments meets or

equals an impairment listed in the Listing of Impairments ("Listing"), listed in the appendix to the regulations. 20 C.F.R. § 416.920(d). Fourth, if disability cannot be found on the basis of the claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to his past relevant work. *Id.* § 416.920(e). And fifth, the impairment must prevent the claimant from doing any work, considering the claimant's residual functional capacity ("RFC"), age, education, and past work experience. *Id.* § 416.920(f); *Crowley v. Apfel,* 197 F.3d 194, 197-98 (5th Cir.1999).

At steps one through four, the burden of proof rests upon the claimant to show he is disabled. *Crowley,* 197 F.3d at 198. If the claimant satisfies this responsibility, the burden shifts to the Commissioner to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. *Id.* If the Commissioner meets this burden, the claimant must then prove that he cannot, in fact, perform the work suggested. *Waters v. Barnhart,* 276 F.3d 716, 718 (5th Cir. 2002).

A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Leggett v. Chater,* 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen,* 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. *Boyd v. Apfel,* 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id.* A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* This Court may neither reweigh the evidence in the record nor

3

substitute its judgment for the Commissioner's, but will carefully scrutinize the record to

determine if the evidence is present. *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000); *Hollis*,

837 F.2d at 1383.

### III.    ISSUES

In his brief, Montgomery presents the following issues:

1. Whether the ALJ's residual functional capacity ("RFC") determination is supported by substantial evidence; and

2. Whether the ALJ erred at Step Five in finding that Montgomery was capable of performing other work that existed in significant numbers in the national economy.

(Plaintiff's Brief ("Pl.'s Br.") at 1, 3-8.)

### IV.    ALJ DECISION

In his April 14, 2011 decision, the ALJ found that Montgomery had not engaged in any

substantial gainful activity since July 29, 2009, the application date.  (Tr. 59.)  He further found

that Montgomery suffered from the following severe impairments: (1) lumbar degenerative disc

disease; (2) peripheral vascular disease; (3) hypertension, and (4) obesity.  (*Id.*)  Next, the ALJ

held that none of Montgomery's impairments, or combination of impairments, met or equaled

the severity of any impairments in the listing.  (*Id.* at 60.)  As to Montgomery's RFC, the ALJ

stated:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary[1] work as defined in 20 CFR 416.967(a) except

---

[1] Sedentary work is defined as follows:

Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying

4

the claimant should avoid climbing ladders, ropes, and scaffolds, avoid exposure to hazardous machinery and unprotected heights, can occasionally climb, balance, stoop, kneel, crouch, and crawl, and requires a hand-held assistive device (cane). The claimant retains the ability to perform said residual functional capacity for a sustained basis; i.e., for a 40-hour workweek. *Watson v. Barnhart*, 288 F.3d 212 (5th Cir. 2002).

(Tr. 60 (footnoted added).) The ALJ noted that Montgomery did not have any past relevant work. (Tr. 65.) Then, the ALJ opined, based on Montgomery's RFC, age, education, and work experience, that Montgomery was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy. . . [and a] finding of 'not disabled' is therefore appropriate under the framework of the . . . rules." (Tr. 66.)

## V.    DISCUSSION

### A. <u>Whether the ALJ's RFC determination was supported by substantial evidence</u>

Montgomery argues that the ALJ's RFC determination is not supported by substantial evidence because the ALJ allegedly failed to consider the "limitations associated with his degenerative disk disease of the lumbar spine and peripheral vascular disease," as shown through the "documented lumbar imaging history" and physical examinations. (Pl.'s Br. at 4-8.) As to Montgomery's lumbar spine limitations, Montgomery alleges that the ALJ failed to consider physical examinations; "MRIs performed on December 29, 2008, June 29, 2009, and November 20, 2010[;] and x-rays performed on February 3, 2009, and July 9, 2010." (Pl.'s Br. at 4.) In addition, Montgomery argues that the new and material MRI evidence he submitted to the

---

out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 416.967(a).

Appeals Council further demonstrated "the degenerative nature of Plaintiff's lumbar spine involvement."[2] (Pl.'s Br. at 5.) As to Montgomery's peripheral vascular disease, Montgomery claims that the ALJ did not properly consider the medical evidence in the record, including the opinions of Montgomery's treating physician, Brent Gordon, M.D. ("Dr. Gordon"). (Pl.'s Br. at 6-7.)

RFC is what an individual can still do despite his limitations.[3] Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *2 (S.S.A. July 2, 1996). It reflects the individual's maximum remaining ability to do sustained work activity in an ordinary work setting on a regular and continuing basis. *Id.*; *see Myers v. Apfel,* 238 F.3d 617, 620 (5th Cir. 2001). A regular and continuing basis is an eight-hour day, five days a week, or an equivalent schedule. SSR 96-8p, 1996 WL 374184, at *2. RFC is not the least an individual can do but the most. *Id.* The RFC is a function-by-function assessment, with both exertional and nonexertional[4] factors to

---

[2] Social Security regulations allow claimants to submit new and material evidence to the Appeals Council when requesting review of an ALJ's decision to deny benefits. 20 C.F.R. § 416.1470(b); *see Rodriguez v. Barnhart,* 252 F. Supp. 2d 329, 332 (N.D. Tex. 2003). The Appeals Council is required to evaluate the entire record, including any new and material evidence submitted by the claimant. *Id.* The Appeals Council's decision to decline to grant review of an ALJ's decision is part of the "final decision" and, as such, is reviewable in federal court. *See Higginbotham v. Barnhart,* 405 F.3d 332, 337-38 (5th Cir. 2005). In the Fifth Circuit, "evidence submitted by a claimant to the Appeals Council does not per se require remand to the Commissioner simply because the Appeals Council failed to address the evidence in its decision." *McGee v. Astrue,* No. 08-0831, 2009 WL 2841113, at *6 (W.D. La. Aug. 28, 2009) (citing *Higginbotham,* 405 F.3d at 332 and *Higginbotham v. Barnhart,* 163 F. App'x 279, 281-82 (5th Cir. 2006) ("*Higginbotham II*")). "A court considering [the] final decision should review the record as a whole, including the new evidence, to determine whether the Commissioner's findings are supported by substantial evidence, and should remand only if the new evidence dilutes the record to such an extent that the ALJ's decision becomes insufficiently supported." *Lee v. Astrue,* No. 3:10-CV-155-BH, 2010 WL 3001904, at *7 (N.D. Tex. July 31, 2010) (citing *Higginbotham II,* 163 F. App'x at 281-82).

[3] The Commissioner's analysis at steps four and five of the disability evaluation process is based on the assessment of the claimant's RFC. *Perez v. Barnhart,* 415 F.3d 457, 461-62 (5th Cir. 2005). The Commissioner assesses the RFC before proceeding from step three to step four. *Id.*

[4] Exertional capacity addresses an individual's ability "to perform each of seven strength demands: Sitting, standing, walking, lifting, carrying, pushing, and pulling." SSR 96-8p, 1996 WL 374184, at *5. Each function must

be considered, and is based upon all of the relevant evidence in the case record. *Id.* at 3-6.  The responsibility for determining a claimant's RFC lies with the ALJ.  *See Villa v. Sullivan*, 895 F.2d 1019, 1023-24 (5th Cir. 1990).  The ALJ must discuss the claimant's ability to perform sustained work activity on a regular and continuing basis and resolve any inconsistencies in the evidence.  SSR 96-8p, 1996 WL 374184, at *7.

In making an RFC assessment, the ALJ must consider all symptoms, including pain, and the extent to which these symptoms can be reasonably accepted as consistent with objective medical evidence and other evidence.  *See* 20 C.F.R. § 416.1529, 416.929; SSR 96-7p, 1996 WL 374186, at *1 (S.S.A. July 2, 1996); SSR 96-8p at *5.  The ALJ must also consider limitations and restrictions imposed by all of an individual's impairments, even impairments that are not severe.  *Id.*  The ALJ is permitted to draw reasonable inferences from the evidence in making his decision, but the social security ruling also cautions that presumptions, speculation, and supposition do not constitute evidence.  *See, e.g.*, SSR 86-8, 1986 WL 68636, at *8 (S.S.A. 1986), *superseded by* SSR 91-7C, 1991 WL 231791, at *1 (S.S.A. Aug. 1, 1991) (only to the extent the SSR discusses the former procedures used to determine disability in children).  The ALJ is not required to incorporate limitations in the RFC that he did not find to be supported in the record.  *See Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991) ("The ALJ as factfinder has the sole responsibility for weighing the evidence and may choose whichever physician's diagnosis is most supported by the record.")  In reviewing the ALJ's decision, a finding of no

---

be considered separately, but the final RFC assessment may combine activities.  *Id.*  Nonexertional capacity "considers all work-related limitations and restrictions that do not depend on an individual's physical strength," including mental limitations.  *Id.* at *6.

7

substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001).

In this case, the ALJ ultimately determined that Montgomery was not disabled because there were a significant number of jobs in the national economy that Montgomery could perform. (Tr. 66.) Before coming to this conclusion, the ALJ found, as stated above, that Montgomery had the RFC to "perform sedentary work . . . except the claimant should avoid climbing ladders, ropes, and scaffolds, avoid exposure to hazardous machinery and unprotected heights, can occasionally climb, balance, stoop, kneel, crouch, and crawl, and requires a hand-held assistive device (cane)." (Tr. 60.) In making his RFC determination, the ALJ relied, *inter alia*, on "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 416.929 and SSRs 96-4p and 96-7p." (Tr. 61.) The ALJ also considered "opinion evidence in accordance with the requirements of 20 CFR 416.927 and SSRs 96-2p, 96-5p, 96-6p, and 06-3p." (*Id.*) In addition, as to Montgomery's lumbar spine issues, the ALJ considered, *inter* alia, the following evidence: (1) Montgomery's testimony regarding the severity of his impairments (Tr. 61-62); (2) a June 2009 lumbar MRI that showed "degenerative disc disease at the lumbosacral junction with associated impingement on the left L5 nerve root and traversing left S1 nerve root and multilevel degenerative changes within the remainder of the lumbar spine" (Tr. 62; *see* Tr. 260-61); (3) a December 2009 consultative orthopedic examination in which Ade Adedokun, RPh., D.O., noted that, even though a lumbosacral spine x-ray showed mild scoliosis and degenerative changes of the lumbar spine, the examination revealed "no lumbosacral sign of

8

spasm, loss of motion, atrophy, or motor or sensory deficit" and Montgomery had normal

strength" (Tr. 62; *see* Tr. 288-90); (3) a March 2010 examination in which Michael Bolesta,

M.D., reported that Montgomery was not taking Naproxen and "had full strength in his upper

and lower extremities, negative straight leg raising test, and decreased sensation in the left lower

extremity from the knee down" (Tr. 62; *see* Tr. 347-48); (4) a June 2010 examination in which

Stephanie Jones, M.D. noted that Montgomery: (a) was not taking Flexeril, Lorcet, or his blood

pressure medication; (b) had full strength and sensation in the upper extremities; (c) was

nontender to palpation along the lumbar spine but reported increased pain with range of motion;

(d) had negative straight leg raising; and (e) had a sensory deficit along the "lateral side of his

calf and foot in the S1-L5 distribution" (Tr. 62; *see* Tr. 353-55); (5) a July 9, 2010 examination

in which Kristen Stegemoller, M.D. "observed intact sensation, strength, and lumbar flexion and

extension, limited internal and external rotation, and weakly positive straight leg raising (Tr. 62;

*see* Tr. 467-68); (6) lumbar spine x-rays taken on July 9, 2010 that showed "degenerative

spurring throughout the lumbar spine, slight narrowed interspaces at L2-3 and L3-4, and minimal

5 mm retrolisthesis of L5 on the sacrum" (Tr. 62; *see* Tr. 309); (7) an August 2010 examination

in which Kent Brantly, M.D., referencing the x-rays taken on July 9, 2010, noted that

Montgomery had "5/5 strength throughout the bilateral upper and lower extremities, full range of

motion throughout, some decreased sensation to the left lateral foot and lower leg, [and]

stretching pain with straight leg raising" (Tr. 63; *see* Tr. 305-06, 309, 466-67, 470); (8) an

October 2010 examination in which Johnny Gibbs, M.D, noted that Montgomery demonstrated

no sensory deficit, was non tender to the midline of his back, had a mildly positive straight leg

raising at about 45 degrees bilaterally, and "demonstrated motor examination to be intact from L2 to S1" (Tr. 63; *see* Tr. 465); (9) evidence that on October 15, 2010, Frank Hailey, ANP, prescribed Montgomery a cane and left knee brace (Tr. 63; *see* Tr. 458); and (10) a November 2010 lumbar MRI that showed, *inter alia*, "multilevel degenerative disc disease" (Tr. 63; *see* Tr. 342). In addition, the ALJ stated that he gave "significant weight to the State agency medical opinions[5] regarding the claimant's physical residual functional capacity insofar as the opinions are consistent with a finding that the claimant is not disabled." (Tr. 65 (footnote added).) The ALJ further noted that the "updated medical evidence and the claimant's testimony support greater limitations." (Tr. 65.)

As to Montgomery's peripheral vascular disease, the ALJ also considered, *inter alia*, the following evidence: (1) a July 2009 examination in which Montgomery reported pain in his legs when walking (Tr. 63; *see* Tr. 388); (2) a lower arterial Doppler dated in July 2009 showing "moderately severe arterial insufficiency at rest in the right lower extremity and moderate arterial insufficiency at rest in the left lower extremity (Tr. 63; *see* Tr. 388); (3) examination notes dated in September 2009 showing that Montgomery was ordered to stop smoking and start a walking exercise regimen (Tr. 63; *see* Tr. 383-84); (4) examination notes dated in December 2009 showing that Montgomery had not tried smoking cessation or a walking program (Tr. 63; *see* Tr.

---

[5] In a Physical Residual Functional Capacity Assessment dated January 6, 2010, State Agency Medical Consultant ("SAMC") Laurence Ligon, M.D. ("SAMC Ligon"), opined that Montgomery: (1) could occasionally lift and/or carry up to 20 pounds; (2) could frequently lift and or/carry up to 10 pounds; (3) could stand and/or walk for a total of at least two hours in an eight-hour workday; (4) could sit about six hours in an eight-hour workday; and (5) had the unlimited ability to push and/or pull. (Tr. 294; *see* Tr. 293-300.) SAMC Ligon further stated that Montgomery could never climb ladders, ropes, or scaffolds and occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. (Tr. 295.) SAMC Ligon's opinions were affirmed on May 25, 2010 by Randal Reid, M.D., another SAMC. (Tr. 301.)

379); (5) evidence that Montgomery "underwent placement of two right superficial femoral artery self-expanding stents in February 2010," which resulted in resolving the pain in his right calf but he continued to report constant pain in the bottoms of both of his feet (Tr. 63; *see* Tr. 406); (6) a January 2011 aortoiliofemoral arteriogram that showed "no evidence of significant aortoiliac occlusive disease, 50 percent stenosis of the left external iliac artery, high-grade in-stent stenosis of 70-80 percent in the distal right superficial femoral artery self-expanding stent, high-grade severe multifocal stenosis in the infrapopliteal circulation on the right side, and left lower extremity proximal anterior tibial artery short-segment occlusion with a distal tibioperoneal trunk, high-grade focal stenosis being identified" (Tr. 63; *see* Tr. 331-33, 336-38); and (7) evidence that in February 2011 Montgomery "underwent right superficial femoral artery stent placement, left external iliac artery stent placement, and left external iliac artery angioplasty" (Tr. 63; *see* Tr. 478-80).

The ALJ further stated:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.
>
> The claimant's allegations concerning his level of pain, subjective complaints, and functional limitations are not entirely credible or reasonably supported by the findings of the objective medical evidence or the inferences there from. There is radiographic evidence of a severe back disorder, but clinical findings do not support a finding of disability. The claimant has preserved lumbar flexion and extension and full strength in his lower extremities. Straight leg raising was negative on several occasions, and only weakly or mildly positive on others, and decreased sensation was not consistently observed. The claimant frequently reported pain of an extreme severity, which seems implausible given the relatively conservative treatment he has received and his repeated

11

noncompliance with medical directives and recommendations, medication, and appointments.

The claimant has received only medication for his allegedly disabling back pain, and denied any medication side effects at the hearing. He was referred for an epidural steroid injection, but after presenting for the injection, he stated that he wanted surgery and declined the injection. The claimant testified that after his peripheral vascular disease is stabilized he may undergo epidural steroid injections, but these injections have not been scheduled. The claimant was referred to physical therapy on multiple occasions, but there is no evidence that he ever attended physical therapy. He was instructed to bring his records and MRI images to his orthopedist, but did not do so because he did not want to spend $20 for the records; however, he was able to obtain cigarettes at that time, admitting to at least a ½ pack a day habit. There is no doubt that the claimant has a severe back impairment that causes physical limitations, but the record as a whole supports a finding that his back disorder is not so severe as to be disabling.

As for the claimant's peripheral vascular disease, although stents have not resolved this impairment, there was improvement of stenosis with stenting and angioplasty and the claimant reported resolution of his right calf pain following his February 2010 stent placement. The claimant alleges significant burning and swelling in his legs and feet, but the objective medical evidence does not document frequent edema, decreased sensation, or abnormalities consistent with the burning sensation he alleges. The claimant was instructed to stop smoking and start walking, but he did not do so, although he later stopped smoking.

(Tr. 63-64 (internal citations omitted); *see*, *e.g.*, Tr. 279-80, 34.) The ALJ further noted that

Montgomery had a history of illegal drug use and that Montgomery's work history showed that

he had only worked sporadically prior to his alleged disability onset date. (Tr. 64; *see* Tr. 153-

60, 181-88.) These facts raised a question "as to whether his continuing unemployment is

actually due to medical impairments" or due to his felony conviction, which "makes him

ineligible for food stamps[] and could act as a major barrier to finding and maintaining

employment." (Tr. 64; *see* Tr. 153-60, 181-88.) The ALJ also noted that Montgomery is able to

12

bathe and dress himself and, although he presently lives in a shelter, he had previously reported that he could prepare his own meals, grocery shop, go to the library and use computers. (Tr. 65.)

The focus of Montgomery's argument appears to be that the ALJ's determination is not supported by substantial evidence because the ALJ misinterpreted or manipulated the evidence, ignored certain evidence, or relied on inconsistent evidence. (*See, e.g.*, Pl's Br. at 3-8.) Contrary to Montgomery's claims and as pointed out above, the ALJ specifically discussed or referenced the MRIs performed on June 29, 2009 and November 20, 2010 and the x-rays taken on July 9, 2010, as well as the numerous physical examinations relating to Montgomery's lumbar spine and peripheral vascular disease. (Tr. 62-63.) Although the ALJ did not discuss every single medical finding in the record, procedural perfection in administrative proceedings is not required as long as the substantial rights of a party have not been affected. *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007) (stating that ALJ's omission does not require remand unless it affected claimant's substantial rights). In this case, there is no evidence that, even if the ALJ had discussed every such finding and opinion, the result would be altered. The ALJ's decision is not subject to reversal, even though there may be substantial evidence in the record that would have supported the opposite conclusion, because substantial evidence also supports the conclusion that was reached by the ALJ. *See Dollins v. Astrue*, 2009 WL 1542466, at *5 (N.D. Tex. June 2, 2009) (citing *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997) and *Steed v. Astrue*, 524 F.3d 872, 874 (8th Cir. 2008)).

Based upon the above, it is clear that the ALJ thoroughly discussed the evidence in the record in making his disability determination, adequately explained the reasoning for such

13

determination and for giving less weight to certain evidence, and exercised his responsibility as factfinder in weighing the evidence and in choosing to incorporate limitations into his RFC assessment that were most supported by the record. *Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991). Because there is substantial evidence in the record that supports the ALJ's disability determination, the Court concludes that remand is not required.

As to the opinion of Dr. Gordon, Montgomery's treating physician, Montgomery claims that the ALJ erred in not giving great weight to Dr. Gordon's findings "in the face that no other treating or examining physician found contradictory limitations." (Pl.'s Br. at 8.) Montgomery claims that the ALJ erred in rejecting Dr. Gordon's opinion because there is other evidence in the record that "strongly support[s] Dr. Gordon's findings, in that Plaintiff has continuously complained of back pain, burning in his legs and feet, and limitations in his ability to walk, stand, and sit for prolonged periods of time." (Pl.'s Br. at 8.)

On September 16, 2010, Dr. Gordon completed a Treating Physician Opinion of Limitations Due to Impairments ("Treating Physician Opinion") in which he opined that Montgomery was capable of sitting continuously for a maximum of two hours before having to walk about for fifteen minutes before returning to a seated position, with the ability to only sit for a cumulative total of four hours in an eight-hour workday. (Tr. 473.) Dr. Gordon also stated that Montgomery was capable of standing and walking for a maximum of fifteen minutes at a time before having to sit, which he would need to do for fifteen minutes before being able to return to standing. (Tr. 473.) Dr. Gordon further opined that Montgomery could stand or walk for a total of two hours in an eight-hour workday and required resting to relieve pain by either

14

lying down or reclining in a supine position for a total of one hour during an eight-hour workday. (Tr. 474-75.)  In addition, Dr. Gordon found that Montgomery was capable of frequently lifting and carrying up to five pounds but was rarely, if ever, capable of lifting and carrying six pounds or more, balancing, or stooping.  (Tr. 475-76.)

In determining that Montgomery had the RFC to perform sedentary work with additional limitations, the ALJ reviewed the opinions of Dr. Gordon, stating:

> I have given no weight to the treating physician opinion[] submitted by . . . Brent Gordon, M.D., limiting the claimant to less than sedentary work.  In evaluating th[is] opinion[], I have considered the length, nature, and extent of the treating relationship, the frequency of examinations, the supportability by other evidence given by the medical source, the extent of the explanation, and the consistency with the record as a whole.  The[] treatment note[] fail to reveal the type of significant clinical and laboratory abnormalities one would expect if the claimant were in fact disabled, and do not support the stated limitations.  In the absence of objective evidence to fully support the opinion[], it appears that the physician[] may have relied quite heavily on the claimant's subjective reports, which are not fully credible for the reasons set forth above.  Furthermore, the opinion[] [is] without support from other evidence in the record. . . . Dr. Gordon opined that the claimant's condition existed and persisted within [the] stated restrictions since April 2006, but there is no medical evidence in the record prior to August 2008 and no evidence that [Dr. Gordon] was treating the claimant in April 2006.

(Tr. 65 (internal citations omitted).)

The regulations, rulings, and relevant case law reflect that the ALJ should weigh all of the medical source opinions and articulate the reasons underlying the decisions he has made.  *See generally* 20 C.F.R. § 416.927(b), (d); *see also* SSR 96-6p; 1996 WL 374180, at *2 (S.S.A. July 2, 1996).  While opinions on the ultimate issue of disability status are reserved to the ALJ, he must consider all medical opinions.  20 C.F.R. § 416.927(b), (d)(1).  Controlling weight is assigned to the opinions of a treating physician if it is well-supported by medically acceptable

15

clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record. 20 C.F.R. § 416.927(c)(2); *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995); *Bowman v. Heckler*, 706 F.2d 564, 568 (5th Cir. 1983). However, the determination of disability always remains the province of the ALJ, and the ALJ can decrease the weight assigned to a treating physician's opinion for good cause, which includes disregarding statements that are brief and conclusory, unsupported by acceptable diagnostic techniques, or otherwise unsupported by the evidence. *Leggett*, 67 F.3d at 566; *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994); *Muse*, 925 F.2d at 790. Conclusory statements to the effect that the claimant is disabled or unable to work are legal conclusions, not medical opinions, and are not entitled to any special significance. *See* 20 C.F.R. § 416.927(d); *see also Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003).

In *Newton v. Apfel*, the Fifth Circuit Court of Appeals held that "absent reliable medical evidence from a treating or examining specialist, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § [416.927]." *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000). Under the statutory analysis of 20 C.F.R. § 416.927, the ALJ must evaluate the following: (1) examining relationship; (2) treatment relationship, including the length, nature, and extent of the treatment relationship, as well as the frequency of the examination(s); (3) supportability; (4) consistency; (5) specialization; and (6) other factors which "tend to support or contradict the

16

opinion." 20 C.F.R. § 416.927(c); SSR 96-6p, 1996 WL 364180, at *3; SSR 96-2p, 1996 WL 374188, at *4 (S.S.A. July 2, 1996).[6]

Assuming, without deciding, that the ALJ was required to go through the factors set forth in 20 C.F.R. § 416.927(c) before rejecting Dr. Gordon's opinions, the Court concludes that the ALJ did properly evaluate such opinions. To begin with, the ALJ, citing to 20 C.F.R. § 416.927, specifically stated that he had considered the factors set forth in the regulation. As to factors one and two under which the ALJ evaluates the examining and treatment relationship between Montgomery and Dr. Gordon, the ALJ clearly recognized that Dr. Gordon was one of Montgomery's treating physicians and was aware of when Dr. Gordon began treating Montgomery. (Tr. 65.) As to factors three, four, and six under which the ALJ evaluates the supportability and consistency of physician's opinion, as well as any other factors that "tend to support or contradict the opinion" (*see* 20 C.F.R. § 416.927(c)(3), (4), (6)), the ALJ noted that Dr. Gordon's treatment notes did not support the limitations stated in the Treating Physician Opinion and the opinions in the Treating Physician Opinion appeared to be based on Montgomery's subjective reports, which the ALJ did not find fully credible. (Tr. 65.) In addition, the ALJ noted that Dr. Gordon's opinions were not supported by other evidence in the

---

[6] Pursuant to *Newton*, however, the ALJ is required to perform a detailed analysis of the treating physician's views under the factors set forth in 20 C.F.R. § 416.927(c) only if there is no reliable medical evidence from another treating or examining physician that controverts the treating specialist. *Newton*, 209 F.3d at 455–57. An ALJ does not have to perform a detailed analysis under the factors in the regulation "where there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another," as well as in cases in which "the ALJ weighs the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id.* at 458; *see Alejandro v. Barnhart*, 291 F. Supp. 2d 497, 507–11 (S.D. Tex. 2003); *Contreras v. Massanari*, No. 1:00-CV-242-C, 2001 WL 520815, at *4 (N.D. Tex. May 14, 2001) ("The Court's decision in *Newton* is limited to circumstances where the administrative law judge summarily rejects the opinions of a claimant's treating physician, based only on the testimony of a non-specialty medical expert who had not examined the claimant.").

17

record that the ALJ had reviewed and set forth in his decision. (Tr. 65; *see* Tr. 60-65.) Because the ALJ properly considered the treatment records and opinions of Dr. Gordon and went through the factors listed in 20 C.F.R. § 416.927(c) before rejecting Dr. Gordon's opinions, the Court concludes that the ALJ did not err.[7]   In addition, as discussed above, there is other evidence in the record that indicates Montgomery's abilities were not so limited. All of the above evidence, taken as a whole, provides "good cause" for not accepting Dr. Gordon's opinions that Montgomery was not capable of performing sedentary work.

### B. Step Five Issues

Montgomery argues that the ALJ erred at Step Five in relying on the vocational expert ("VE")'s testimony that he was capable of performing other work that existed in significant numbers in the national economy because "it is unclear whether Plaintiff's need for a hand-held assistive device would impede his ability to perform the required work-related activities." (Pl.'s Br. at 9.) As stated above, the ALJ found in his RFC determination that Montgomery had the ability to perform sedentary work "except [Montgomery] should avoid climbing ladders, ropes, and scaffolds, avoid exposure to hazardous machinery and unprotected heights, can occasionally climb, balance, stoop, kneel, crouch, and crawl, and requires a hand-held assistive device (cane)." (Tr. 60.) During the hearing before the ALJ, the ALJ and Montgomery had the following discussion regarding his need for a cane:

---

[7] As to factor five, more weight is generally given "to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. § 416.927(c)(5). *See also Newton*, 209 F.3d at 455. Factor five does not apply here because neither the record, nor either party's brief indicates Dr. Gordon is a specialist of any sort. Thus, his opinion is entitled to no additional weight under this factor.

[ALJ:] I see that you have a cane today.

[Montgomery:] Yes.

[ALJ:] Was—do you use that all the time?

[Montgomery:] Yes, I do.

[ALJ:] Inside and outside?

[Montgomery:] Yes, I do.

[ALJ:] Who told you you should get a cane?

[Montgomery:] I've been using one off and on for about three years now, but back in October/November, [INAUDIBLE], he's a nurse practitioner, I believe that's what he is, Dr. Frank . . . .

. . . .

[ALJ:] Okay.  If you don't have the cane, what happens?

[Montgomery:] I hurt.  I usually lean on it, really . . . .

[ALJ:] Okay.  Do you have any problems using your hands or your fingers when you're sitting down?

[Montgomery:] No, sir.

(Tr. 28-29.)  In addition, the ALJ and the VE had the following discussion regarding the cane:

[ALJ:] Assume a person of claimant's age, education, and work experience, who is able to lift and carry up to 10 pounds occasionally; stand and walk for about two hours, and sit for up to six hours in an eight-hour day with normal breaks; would have to avoid climbing ladders, ropes, or scaffoldings, and would also have to avoid exposure to hazardous machinery or unprotected heights; would be further limited to occasional climbing, balancing, stooping, kneeling, crouching, and crawling; and would be further limited to jobs requiring handheld assistive device.  Would such a person—would there be jobs for such a person?

. . . .

19

[VE:] –handheld assistive device?  What are you talking about?

[ALJ:] Cane.

[VE:] Okay. . . . I just wanted to make sure.

[ALJ:] Okay.  Yeah, not a walker.

[VE:] For the most part, its sedentary work.  They're gonna [sic] be sitting the majority of the day—

[ALJ:] Okay.

[VE:] –for the six hours, would just be moving around a small bit.  There are sedentary unskilled jobs like call-out operator, like is like a credit checker. . . . There are also sedentary unskilled assembly-type positions or production assistants. . . . And there are . . . sedentary, unskilled inspecting-type positions.

(Tr. 46-47.)  Although neither the VE nor the ALJ identified any of the specific DOT codes associated with such positions, the ALJ stated in his decision that the VE's "testimony is consistent with the information contained in the *Dictionary of Occupational Titles*."  (Tr. 66 (emphasis in original).)

Montgomery first claims that SSR 00-4p[8] "requires the ALJ to elicit a reasonable explanation for conflicts existing between a vocational expert's testimony and the information

_____

[8] SSR 00-4p, as relevant here, states:

When a VE . . . provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflicts between that VE . . . evidence and information provided in the DOT.  In these situations, the adjudicator will:

Ask the VE . . . if the evidence he or she has provided conflicts with information provided in the DOT; and

If the VE's . . . evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.

SSR 00-4p, 2000 WL 1898704, at *4 (S.S.A. Dec. 4, 2000).

included in the DOT." (Pl.'s Br. at 9.)  Montgomery, however, has failed to explain how the

VE's testimony *actually conflicts* with any provision within the DOT.  Moreover, even assuming

there was a conflict[9] between the VE's testimony and the information contained in the DOT,

such a conflict is not a direct or obvious conflict;[10] instead, it would be an implied or indirect

---

[9] When, as here, the ALJ reaches his disability determination at Step Five, it means that the claimant established a *prima* facie case of disability and the burden shifted to the Commissioner to show that other work exists in the national economy that the claimant can perform despite his impairments. *See Chaparro v. Bowen*, 815 F.2d 1008, 1010 (5th Cir. 1987); *Allsbury v. Barnhart*, 460 F. Supp. 2d 717, 720 (E.D. Tex. 2006). When determining whether the claimant could adjust to alternative work that is within his RFC and that exists in significant numbers in the national economy, the ALJ may consult several sources, including the DOT and a VE.  20 C.F.R. § 416.966(a), (d), (e).  The availability of more than one approved source, however, presents the risk of conflict between the DOT's job descriptions and the VE's opinion regarding both the claimant's ability and the jobs' availability. *Gaspard v. Soc. Sec. Admin, Comm'r*, 609 F. Supp. 2d 607, 613 (E.D. Tex. 2009).

The Fifth Circuit has held that where there is a conflict between the VE's testimony and the DOT, the ALJ may rely upon the VE's testimony, provided that the record reflects an adequate basis for doing so. *Carey v. Apfel*, 230 F.3d 131, 146 (5th Cir. 2000).  Because this type of conflict surfaced somewhat frequently, the Commissioner issued SSR 00-4p to ensure that ALJs would expose and reconcile such conflict before relying on VE testimony. *Id.*; SSR 00-4p, 2000 WL 1898704 (Dec. 4, 2000).  Specifically, the ruling unambiguously establishes the ALJ's affirmative duty to bring to light and explain any possible conflict between the VE's testimony and the DOT.  When there is a conflict, neither the DOT nor the VE evidence automatically "trumps" the other. *Id.*  The conflict must be resolved by determining whether the VE's explanation is reasonable and provides a basis for relying on the VE testimony rather than on the DOT information. *Id.*  The ALJ must explain in his decision how any conflict that has been identified was resolved. *Id.*

[10] Before SSR 00-4p became effective, the Fifth Circuit decided *Carey* to resolve whether VE testimony that conflicts with the DOT can provide substantial evidence to support the Commissioner's decision. *Carey*, 230 F.3d at 143-45 (identifying the various positions taken by other circuits); *see Johnson v. Astrue*, No. 11-3030, 2012 WL 5472418, at *8 (E.D. La. Oct. 5, 2005).  The Fifth Circuit joined the majority of circuits in adopting a "middle ground approach," under which "neither the DOT nor the vocational expert testimony is per se controlling." *Carey*, 230 F.3d at 145-47.  However, under this approach, the ALJ's "discretion to choose between conflicting evidence is not unfettered" and in part depends on the nature of the conflict. *Romine v. Barnhart*, 454 F. Supp. 2d 623, 627 (E.D. Tex. 2006); *see Carey*, 230 F.3d at 146-47.

*Carey* identified three types of conflict and limited its holding to "implied or indirect" conflict, which is characterized as being tangential in nature and unapparent until further inference is made. *Carey*, 230 F.3d at 145-47; *see Johnson*, 2012 WL 5472418, at *9 ("A tangential, implied or indirect conflict occurs when there is no direct conflict between the expert testimony regarding the exertional or skill level required for a particular job and the [DOT], but additional inferences can be drawn (and the plaintiff is asking the court to draw them on appeal) that the [DOT] description may conflict with the [VE's] testimony that the claimant is capable of performing a particular job.").  In *Carey*, the claimant had only one arm, and the jobs in question required manual dexterity. *Carey*, 230 F.3d at 146.  The court decided the conflict was implied or indirect because it did not even become apparent until "further inference is made that the jobs require manual dexterity with, not one, but two hands." *Id.*  The court held

21

conflict.[11] "All kinds of implicit conflicts are possible and the categorical requirements listed in the DOT do not and cannot satisfactorily answer every such situation." *Adams v. Astrue*, No. CV-07-1248, 2008 WL 2812835, at *3 (W.D. La. June 30, 2008). "The Fifth Circuit has held that claimants should not be permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT, and then present the conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing." *Id.*; *see Carey*, 230 F.3d at 142. Montgomery, who was represented by an attorney at the hearing before the ALJ and whose attorney was specifically asked by the ALJ if he had any questions regarding the VE's testimony

---

that, to the extent the VE's testimony impliedly or indirectly conflicts with the DOT, "the ALJ may rely upon the [VE]'s testimony provided that the record reflects an adequate basis for doing so." *Id.* In so holding, the court reasoned that a claimant who did not raise implied conflict at the administrative hearing cannot be permitted to thereafter peruse the record in search of such conflict to present as reversible error. *Id.* at 146-47.

    *Carey* distinguished implied or indirect conflict from two other types of conflict: (1) the "direct and obvious" conflict, which exists when the VE's testimony conflicts with the DOT, and (2) the "less obvious" conflict, which arises when the VE's testimony "creates a conflict or discrepancy between the ALJ's [RFC] determination . . . and the DOT job descriptions." *Id.* at 145-46; *see Johnson*, 2012 WL 5472418, at *8 (stating that there are two ways VE's testimony can create a direct conflict: (1) when the VE testifies that a particular job requires a particular exertional or skill level when the DOT expressly provides that the job requires a different exertional level and (2) when the VE's testimony places the ALJ's RFC finding or the claimant's specific impairments in conflict with the exertional or skill level or the specific skills required for the identified jobs in the DOT). Courts have continued to treat both the "direct and obvious" conflict and the "less obvious" conflict as "direct conflicts," a category of conflicts separate and distinct from the implied or indirect conflict. *See Graham v. Comm'r of Soc. Sec. Admin.*, No. 3:08-CV-2133-N (BH), 2009 WL 3199382, at *7 (N.D. Tex. Oct. 2, 2009); *Augustine v. Barnhart*, No. 1:00-CV-749, 2002 WL 31098512, at *9 (E.D. Tex. Aug. 27, 2002) (referring to obvious conflict and less obvious conflict as "direct conflict scenarios").

[11] The DOT code for a call-out operator is 237.367-014. DOT, This position is described as follows:

    Compiles credit information, such as status of credit accounts, personal references, and bank accounts to fulfill subscribers' requests, using telephone. Copies information onto form to update information for credit record on file, or for computer input. Telephones subscriber to relay requested information or submits data obtained for typewritten report to subscriber.

DOT § 237.367-014 (rev. 4th ed. 1991).

(Tr. 48), did not raise any such implied conflict at the administrative hearing. Consequently, Montgomery will not now be permitted to peruse the record in search of a conflict to present as reversible error and, instead, is found to have waived such argument. *See, e.g., Young v. U.S. Comm'r of Soc. Sec.*, No. CV08-0474, 2009 WL 2827945, at *13 (W.D. La. Sept. 1, 2009).

Montgomery next argues that the ALJ erred in relying on the VE's testimony at Step Five that was based on a hypothetical that failed to clarify "the manner in which Plaintiff is required to use a hand-held assistive device, whether it be for assistance in walking or standing or for balancing." (Pl.'s Br. at 10.) Specifically, Montgomery claims that because the listed occupations "require, at a minimum, the ability to handle and finger occasionally" the VE could not know from the hypothetical whether a person using a "hand-held assistive device" would be capable of occasionally handling or fingering. (Pl.'s Br. at 10.) In support of his argument, Montgomery relies on SSR 96-9p, which states, in part:

> To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information). The adjudicator must always consider the particular facts of a case. For example, if a medically required hand-held assistive device is needed only for prolonged ambulation, walking on uneven terrain, or ascending or descending slopes, the unskilled sedentary occupational base will not ordinarily be significantly eroded.
>
> Since most unskilled sedentary work requires only occasional lifting and carrying of light objects such as ledgers and files and a maximum lifting capacity for only 10 pounds, an individual who uses a medically required hand-held assistive device in one hand may still have the ability to perform the minimal lifting and carrying requirements of many sedentary unskilled occupations with the other hand. For example, an individual who must use a hand-held assistive device to aid in walking or standing because of an impairment that affects one lower extremity (e.g., an unstable knee), or to reduce pain when walking, who is limited to sedentary work because of the impairment affecting the lower extremity, and who has no other functional limitations or restrictions may still have

the ability to make an adjustment to sedentary work that exists in significant numbers. On the other hand, the occupational base for an individual who must use such a device for balance because of significant involvement of both lower extremities (e.g., because of a neurological impairment) may be significantly eroded.

In these situations, too, it may be especially useful to consult a vocational resource in order to make a judgment regarding the individual's ability to make an adjustment to other work.

SSR 96-9p, 1996 WL 374185, at *7 (S.S.A. July 2, 1996).

A vocational expert is called to testify because of her familiarity with job requirements and working conditions. *Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir. 1995) (citing *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986)). "The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed." *Id.* The ALJ is not required to incorporate limitations into the hypothetical questions presented to the VE that he did not find to be supported in the record. *See Morris v. Bowen*, 864 F.2d 333, 336 (5th Cir. 1988). The hypothetical presented to the vocational expert must reasonably incorporate all of the disabilities recognized by the ALJ's residual functional capacity assessment, and the claimant or his representative must be afforded the opportunity to correct any deficiencies in the ALJ's question. *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994). If the ALJ's hypothetical fails to incorporate all such functional limitations, the ALJ's determination is not supported by substantial evidence. *Id.* A claimant's failure to point out problems in a defective hypothetical does not salvage that hypothetical as a proper basis for a disability determination. *Boyd v. Apfel*, 239 F.3d 698, 707 (5th Cir. 2001).

In this case, it is clear that the ALJ's hypothetical question to the VE included all the limitations the ALJ had found in the RFC determination. Thus, the hypothetical to the VE was

24

not defective. The critical issue is whether the ALJ erred in relying on the VE's testimony that indicated that there were jobs that Montgomery could perform that existed in substantial numbers in the national economy because there was not enough information presented regarding the requirement that Montgomery use a hand-held assistive device. In this case, it is clear that the VE was aware that the hand-held assistive device required by Montgomery was in fact a cane and not a walker. In addition, based on Montgomery's own testimony at the hearing, the evidence shows that Montgomery needed the cane due to pain and not for balance. Such evidence fulfills the requirements of SSR 96-9p as the VE was aware of Montgomery's limitations with the cane and found that such limitations would not significantly erode Montgomery's ability to perform the unskilled sedentary jobs found by the VE. Because substantial evidence supports the VE's testimony that there were jobs that Montgomery could perform that existed in substantial numbers even when Montgomery needed to use a cane for pain, the ALJ did not err on relying on the VE's testimony. Consequently, remand is not required.

## RECOMMENDATION

It is recommended that the Commissioner's decision be affirmed.

### NOTICE OF RIGHT TO OBJECT TO PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATION AND CONSEQUENCES OF FAILURE TO OBJECT

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions, and recommendation within fourteen (14) days after the

25

party has been served with a copy of this document. The United States District Judge need only

make a de novo determination of those portions of the United States Magistrate Judge's proposed

findings, conclusions, and recommendations to which specific objection is timely made. *See* 28

U.S.C. § 636(b)(1). Failure to file by the date stated above a specific written objection to a

proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error

or manifest injustice, from attacking on appeal any such proposed factual findings and legal

conclusions accepted by the United States District Judge. *See Douglass v. United Services Auto

Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

### ORDER

Under 28 U.S.C. § 636, it is hereby **ORDERED** that each party is granted until ~~August~~ September

**6, 2013** to serve and file written objections to the United States Magistrate Judge's proposed

findings, conclusions and recommendation. It is further **ORDERED** that if objections are filed

and the opposing party chooses to file a response, the response shall be filed within seven (7)

days of the filing date of the objections.

It is further **ORDERED** that the above-styled and numbered action, previously referred

to the United States Magistrate Judge for findings, conclusions and recommendation, be and

hereby is returned to the docket of the United States District Judge.

SIGNED August **23**, 2013.

JEFFREY L. CURETON
UNITED STATES MAGISTRATE JUDGE

JLC/knv

26